Decree for libellants.

See The Canton [Case No. 2,388]; McCormick v. Ives [Id. 8,720].

---

## Case No. 9,191.

### The MARY.

[1 Ware (454) 465; [1] 1 Law Rep. 157; 20 Am. Jur. 421.]

District Court, D. Maine. Aug. 18, 1838.

SEAMEN'S WAGES — WHEN TO BE PAID — CUSTOM OF PORT — PROVISIONS — SHORT ALLOWANCE— DOUBLE PAY—EQUIVALENTS—NAVY RATION.

1. A mariner is entitled to his wages as soon as he is voluntarily discharged from the vessel; and if not paid within ten days after his discharge he may have process from a court of admiralty against the vessel to enforce the payment.

[Cited in The Annie M. Smull, Case No. 423.]

2. Whether the seamen are bound to remain by the vessel after the voyage is ended and assist in discharging the cargo, depends on the custom of the port.

[Cited in Packard v. The Louisa, Case No. 10,652.]

3. If a vessel has not the quantity and kind of provisions required by the act of congress of July 20, 1790, § 9 [1 Stat. 135], and the crew are put on short allowance, they are entitled to double wages for every day that the short allowance is continued.

[Cited in The Childe Harold, Case No. 2,676; The John L. Dimmick, Id. 7,355; Foster v. Sampson, Id. 4,982; Collins v. Wheeler, Id. 3,018.]

4. But when the master is unable to obtain the kind of provision which the statute names, other kinds may be substituted as equivalents.

5. When the crew are put upon an allowance and there is a controversy whether it be short or not, the navy ration is assumed as the standard of a proper allowance.

This was a suit for subtraction of wages. The libel sets forth a contract for a voyage from Portland to Goree in Africa and the Cape de Verd Islands, and back to her port of discharge in the United States, for wages at the rate of eighteen dollars a month, alleges the faithful performance of the contract, and claims a balance due of $48.08. In another article the libellant claims extra wages in consequence of being put on short allowance of provisions for twenty-two days during the return voyage. The answer of the owner admits the contract, the service, and the balance due, as alleged in the libel, and avers that he is, and always has been ready to pay the sum, and brings the money into court, and alleges that the libellant has never demanded it. The answer denies that the crew was put on short allowance, and avers that they were at all times supplied

[1] [Reported by Hon. Ashur Ware, District Judge.]

with a sufficient quantity of good and wholesome provisions of the kind usually furnished in such voyages. The answer also contains an allegation that at the time when the libel was filed in court ten days had not elapsed since the discharge of the crew.

Mr. Haynes, for libellant.
Mr. Fox, for respondent.

WARE, District Judge. The first question raised by the pleadings in this case, in the natural order in which they present themselves, is whether the suit is prematurely instituted. The allegation of the answer, on this point, is incorrect in point of form, but if the facts bring the case within the exception it is susceptible of amendment. The statute does not prevent the filing of a libel before the expiration of ten days, but the issuing of process against the vessel. Whether this objection is available for the respondent upon the facts as they are proved, depends on the construction of the sixth section of the act of July 20, 1790, c. 56 [1 Story's Laws, 106; 1 Stat. 135, c. 29]. The particular clause fixing the time when admiralty process may be issued against the vessel, provided the wages are not paid, has been thought to be not of very easy interpretation. It is in these words: "As soon as the voyage is ended, and, the cargo or ballast fully discharged at the last port of delivery, every seaman or mariner shall be entitled to the wages which shall then be due according to his contract; and if such wages shall not be paid within ten days after such discharge, or if any dispute shall arise between the master and seamen, or mariners, touching the said wages, it shall be lawful," &c. And at the close of the section it is further provided, that nothing herein contained shall prevent any seaman or mariner from having or maintaining any action at common law, for the recovery of his wages, or from immediate process of any court having admiralty jurisdiction, wherever any vessel may be found, in case she shall have left the port of delivery where her voyage ended before payment of wages, or in case she shall be about to proceed to sea before the end of the ten days next after the delivery of her cargo or ballast.

One difficulty in the construction of the act, is supposed to arise from coupling the two phrases, "as soon as the voyage is ended," and "the cargo or ballast is fully discharged." The statute seems to have been framed upon the idea, either that these two phrases are identical in their meaning, the latter being added as merely exegetical of the former; or that by the principles of law, the seamen are bound to remain with the vessel until the cargo is fully discharged. But it is quite clear that in the maritime sense of the word, the voyage is ended when the vessel has arrived at her last port of destination, not always her last port of delivery, and is safely

moored at the wharf. Cloutman v. Tunison [Case No. 2,907]; Edwards v. The Susan [Id. 4,299]. The cargo may have been delivered at any other port, and thus the discharge of the cargo happens before the end of the voyage, yet the seamen are unquestionably bound to bring her to her last port of destination, and their wages will not be due by their contract until that time; or what is more common, the last port of delivery may be the last port of destination, and then the voyage will be ended before any part of the cargo is discharged. And further, admitting what is not perhaps quite clear, that the seamen are, by the general principles of the marine law applicable to their contract, bound to remain by the vessel and assist in discharging the cargo, the general principle may be controlled by an established usage to the contrary. In this port, and it is believed in most of the ports of the United States (Dunl. Adm. Prac. 98), the uniform custom on the return of a vessel from a foreign voyage is to discharge the crew before unlading the vessel, and to employ other persons to perform that service. It is a custom so uniform, general, and of so long standing, that it may fairly be considered as entering into, and making part of the implied terms of the contract. The end of the voyage and the delivery of the cargo do not therefore refer to the same time according to the established usage of this port. The end of the voyage is when the vessel has arrived and is safely moored at the wharf, or when the master has provided other men to take the place of the crew and assist in unlading the cargo. The owner in the present case acted upon this custom. The vessel arrived in the afternoon of Saturday the 28th of July; and the crew were discharged the same day. Their wages were made up including and terminating with that day, and some of them paid on Monday. The sum brought into court and admitted to be due to the libellant includes Saturday only, and no complaint is made that he left the vessel before the voyage was ended, or that he had not completely performed his contract. It is manifest, therefore, that both the owners and the seamen considered the voyage for which they contracted as ended when the ship was made fast to the wharf and before the discharge of the cargo.

The statute declares that when the voyage is ended, and the cargo or ballast discharged, the seamen shall be entitled to their wages. If by the terms of the contract or the usage of the place, the seamen are bound to remain in the vessel and assist in unlading the cargo, then on common principles they will not be entitled to their wages until the cargo is discharged. The contract is entire, and they are not entitled to their pay until it is completed. But if by the terms of the contract or the usage of the place, their term of service and with it their wages terminate with the end of the voyage, and before the unlading of the vessel, then on the same

principle they are entitled to their wages when their term of service expires. In such a case, when do the ten days begin to run; is it from the end of the voyage, or from the discharge of the cargo? It cannot be from both. My opinion is, that the intention of the legislature was, that they should begin to run from the time when the wages become due, that is from the day when the term of service is completed. They are then of common right entitled to their pay. The statute couples the two phrases, the end of the voyage and the discharge of the cargo at the last port of delivery, and declares that the seamen shall then be entitled to their wages. Now it cannot without violence be presumed that the legislature intended to establish any new and peculiar principles of law to be applied to contracts of seamen in this particular. But if it is contended that the time begins to run from the time when the cargo is discharged at the last port of delivery, and that is not the port of final destination where the voyage ends according to the contract, then the statute would declare the wages to be due before the contract was fully performed. If the final port of destination is the last port of delivery, and by the usage of the place the term of service expires with the end of the voyage, that is, when the vessel is safely moored at the wharf, then a similar inconsequence will result in an opposite sense, and the legislature will be made to declare that the wages are not due until an indefinite period after the contract has been fully performed, that is, until the cargo is completely discharged. The difficulty will be avoided by holding that the time runs from the day the men are discharged. The wages are then completely earned, and of common right are due, and this, I think, was the intention of the legislature. This is the construction which has been given to the statute by Judge Peters. Edwards v. The Susan [supra]; Thompson v. The Philadelphia [Case No. 13,973]; The Happy Return [Id. 13,697]. It is also the settled construction of the statute in Massachusetts district. Holmes v. Bradshaw [Id. 6,635], Dist Ct. Mass. Dec., 1823; Dunl. Adm. Prac. 99. And though some hesitation has been expressed as to the soundness of this construction, it appears to me to be open to fewer objections than any other. Abb. Shipp. 635, note. In the present case process was not issued until the expiration of ten days including the day of discharge.

We come then to the principal question in the cause, whether any extra wages are due in consequence of the crew being put on short allowance. By the ninth section of an act of July 20, 1790, c. 56 [1 Story's Laws, 106; 1 Stat. 135, c. 29], every vessel of 150 tons burden or more, bound on a voyage across the Atlantic, is required to have 100 pounds of salted meat, and 100 pounds of bread for every person on board, independent of any other stores of live-stock which

shall be put on board by the master or passengers, and in a like proportion for a longer or a shorter voyage; and if not so provided, and the crew shall be put on short allowance, then each of the crew shall be entitled to one day's wages extra for every day they shall be kept on short allowance.

It is admitted that there was not in this case the quantity of provisions on board which is required by law, and it is also proved and admitted that during part of the time, on the return voyage, the crew was put on an allowance; but it is denied that it was a short allowance. The law fixes with precision the amount and kind of provisions which a vessel is required to have on board. In its terms it does not admit of any substitutes for the kinds prescribed. But courts have thought that when a vessel happens to be in a port where it is not in the power of the master to obtain provisions of the amount and description directed by the law, other articles may be substituted which are of equivalent value. Mariners v. The Washington [Case No. 9,086]. This temperament has been introduced in the construction of the statute upon the reasonable presumption that the law does not intend to require of the master impossibilities. But when the courts by an equitable construction have introduced a qualification, and liberated the owners from the penal operation of the law against its letter, they are bound to see that the substitutes offered are a full equivalent, both in quantity and quality, for that required by the text of the law; the more so as the policy of the law addresses itself so strongly to the interests of humanity, it being intended to guard against the dreadful sufferings of famine while the ship's company are isolated from all the world and under a positive impossibility of relieving themselves.

This vessel, on her departure from Cape Bonavista, had considerably less than half the amount of bread and salted meat required for a vessel crossing the Atlantic. And all she had, which can fairly be considered as a substitute, was less than one fourth of a barrel of flour and about a half a barrel of beans. The whole live-stock was one pig and three goats, with about a bushel of corn to feed them, but this is expressly excluded from being admitted as a substitute for salted provisions. It is unnecessary to waste words to prove that these trifling stores could be no equivalent for the deficiency of the bread and salted meat. The master endeavored to replenish his stores at Cape Bonavista, but provisions could not be purchased at any price. He was obliged to sail with what he had, and nine days after leaving port the men were put on an allowance of three biscuits a day, and a few days after on an allowance of one pound of beef.

Whether the required quantity of provisions is on board or not, it is the duty of the master to oversee and regulate their expenditure. It does not follow that because they are dealt out in fixed and limited quantities, the men are put on short allowance. It must be shown that the allowance is not in a reasonable amount, not enough for the ordinary consumption of a man. What that reasonable quantity is, has not been determined by the statute. But in fixing the rations of the army and navy, the legislature has shown what they consider a proper allowance. The army ration is fixed at one pound and a half of beef, or three quarters of a pound of pork, and eighteen ounces of bread. Act March 16, 1802, c. 9, § 6 [2 Story's Laws, 831; 2 Stat. 134, c. 9]. The navy ration varies with the different days of the week, and is not made up exclusively of bread and meat, but is on the whole rather larger than that of the army. Act March 3, 1805, c. 91, § 3. A seaman in the merchant service requires as much food as one in the navy, and the navy ration has been assumed as the standard by which the allowance in the merchant service ought to be regulated. Mariners v. The Washington [supra]; Gardner v. The New Jersey [Case No. 5,233]. In the present case the allowance was one pound of beef, and, at most, not more than twelve ounces of bread. This is precisely two thirds of the army ration, and a little less than that proportion of the ration for the navy. To make up this deficiency there was, for the whole passage of thirty-two days, not more than forty pounds of flour and about half a bushel of beans to be divided among nine persons. This would make but a very small addition to the allowance, and if we assume the navy ration as the standard, it is quite clear that the men were on a short allowance.

But it is urged, as an argument that the allowance was sufficient, that some of the men did not consume the whole of what was allowed. This is true; but it should be added that they took care to have their savings carefully locked up in their chests. They knew that their stock of provisions was short, and that it was altogether uncertain when they would obtain more, and how long they would be under the necessity of sustaining life on what they had. It was therefore prudent and natural that they should practise the utmost frugality, and save all that could be spared from the urgent calls of nature, against a time of need, which they might reasonably have contemplated as not a very remote possibility; for if the voyage had been prolonged but a few days more, the crew must have suffered from absolute famine. I have no doubt that it was owing to unexpected contingencies that the vessel was left with this short supply of provisions, and not to the want of ordinary prudence or forecast on the part of the owners. Their intention was to have had an addition made to her stores for the return voyage, in a foreign port. But unfortunately, and without any fault on their part, they could not be obtained. A court, however, which

is bound to administer the law, cannot take these circumstances into consideration. The text of the law is imperative, and it is framed in the spirit of wisdom and humanity; and the interests of commerce as well as humanity require that it should be carried into effect. The putting the crew upon an allowance, was, under the circumstances of the case, if not a matter of absolute necessity, one of prudence, and there cannot be a reasonable doubt but that it was a short allowance. According to the testimony of the cook, they were upon allowance twenty-two days, but the statement of the mate is, that they were upon allowance nine days after leaving Bonavista, and the allowance was discontinued five days before their arrival in this port. As the passage was thirty-two days, that will leave eighteen. In addition to the balance of wages, I shall allow extra pay for eighteen days.