## Case No. 6,411.

### The HERMON.

[1 Lowell, 515.][1]

District Court, D. Massachusetts. 1870.

WAGES—SHORT ALLOWANCE—SETTLEMENT.

1. Seamen who were paid their wages in full in a foreign port and demanded their discharge there, but were refused it by the master and by the consul, and left the ship with the connivance of the master, were allowed by the court the two months' extra wages, though the case appeared to be one in which the consul might properly have remitted it; the men not having had the choice presented to them.

2. It seems, that bread carried in a locker which is in a well-built house on deck, is not stowed under deck as required by the act of 1790 [1 Stat. 131].

3. Where an insufficient quantity of bread was provided for a foreign voyage, the crew are entitled to the extra wages if put on short allowance, though the immediate cause of the deficiency was the spoiling of part of the bread by sea peril.

[Cited in Broux v. The Ivy, 62 Fed. 603.]

4. It seems, that flour cooked into good bread by the ship's cook, and served out in that form may be a substitute for ship-bread, though flour served out to the men would not be.

5. Where the crew had the full navy ration of meat, and a short allowance of bread and of other articles, like beans, rice, &c., they were held entitled to but one extra day's pay for each day's short allowance.

6. A foreigner shipped at a foreign port, and discharged at a foreign port in accordance with his contract, is not entitled to two months' extra pay.

[Cited in Gove v. Judson, 19 Fed. 524.]

7. A settlement deliberately made by a seaman with the advice of his proctor will not be opened.

[Cited in Wilson v. Borstel, 73 Me. 275.]

The libellants demanded a balance of their contract wages for the voyage from Baltimore to Acapulco, thence to Callao, the Chincha Islands, Gibraltar, and Valencia; two months' wages for their discharge at Valencia, and a very large sum for alleged short allowance of bread and meat during a considerable part of the fifteen months of the voyage. The answer averred that the men were paid in full at Valencia, and that each signed a receipt which was read by or to him and understood; that they afterwards deserted the ship, and so forfeited the two

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

months' wages; that although there was short allowance for a few weeks, ending at Gibraltar, this was caused by a disaster, and was not in either bread or meat, but only in peas, beans, and rice.

The first question was whether the contract wages were paid in full at Valencia. Here, and throughout, there was an irreconcilable contradiction between the witnesses. The master promised to pay the men, and he produced their receipts in full. He and the mate swore that the crew were called separately into the cabin, and that their accounts were explained to them and the balances paid in gold or its equivalent, in some cases after discussion of items. Each man swore to the sum which he received, which in no single instance agreed with the receipt and with the master's statement. The judge found as matter of fact that the men had been paid in full at Valencia, and that the articles were ambiguous in their description of the voyage, so that it might well be a question whether it ended at Valencia, and continued:—

C. G. Thomas and J. J. Storrow, for libellants.

H. W. Paine and R. D. Smith for claimants.

LOWELL, District Judge. The next question is whether the men were entitled to two months' extra wages. It is said that the statutes of 1803 [2 Stat. 203], 1840 [5 Stat. 394], and 1856 [11 Stat. 52], taken together, admit of no other construction than that men who are discharged in a foreign port must have the statute compensation, even though the voyage, by its terms, ends in that port, unless the consul remits the payment in certain contingencies. This is a point of some nicety. The ninth clause of the act of 1840 gives the consul power to remit the extra pay if the seamen insist on their discharge and the master is in no fault. The present case seems to be one eminently fit for such action on the consul's part, because the seamen insisted that the voyage was ended, thus bringing themselves directly within section nine of the act of 1840, and I regret that it was not taken. Instead of this the master appears to have devised a fictitious desertion. It is plain that the desertion was planned beforehand with the master's consent, because he never would pay his men in full and let them all go on shore if he expected to reclaim them. Under these peculiar circumstances, I ought to give the men the two months' wages, because for some reason or other the master failed to get the consul's consent to their remission, and his defence of a desertion utterly fails. Perhaps I could remit the wages, though the consul had not been called on, in some cases; but in this the crew were not treated on the footing of persons discharged, but as deserters, which they were not. If the crew had been clearly shown the alternative, I do

not know what they might not have chosen to proceed in the vessel rather than forfeit the extra pay; nor can I tell what facts or arguments they had it in their power to exhibit to the consul or to me, why they should be discharged on the usual terms. The question has never been fairly presented to them, nor the issue fairly made up. I cannot say what the consul's views were. If he thought the voyage was not up, I do not understand why he should advise that the men be paid off; and if it was up, he should have adjudicated this matter of the extra wages. For deserters, the men were treated remarkably well; and for persons entitled to be discharged, not so well. They were to be deserters, I suppose, to the extent of forfeiting their extra wages, but for no other purposes. This desertion quo ad hoc is new to me.

The remaining question concerns the alleged short allowance. The seamen do not agree very well with each other or with the witnesses for the claimants on this matter. I have read over the evidence with some care, and am not satisfied that there was short allowance of bread or meat until some time after the disaster off Cape Horn, which occurred about seventy-two days before the ship arrived at Gibraltar. The libel which was first filed said nothing about short allowance. The others state it, as I have said, variously. Whether the time of the vessel's stay at the Chincha Islands, waiting for guano, can be called a voyage, and if so, how long a voyage, under the statute, I consider to be doubtful. But I do not find in the evidence that there was any short allowance at that time, nor until about sixty days from Gibraltar. Off Cape Horn, in a very severe gale, the ship was much injured, especially by heavy seas, which broke in the cabin doors and windows, and spoiled a good deal of the bread which was in the locker made for the purpose in a place usually adopted for lockers in large vessels in this trade. It has been a point of dispute whether this locker was under deck as required by the statute. The evidence shows that the cabin was on the main deck, in a very strong and well-built house, and that the poop deck came over a part of the cabin, but not over that part in which the locker was situated. In common speech, the locker was in a house on deck, and I am inclined to the opinion that it was not under deck in the sense of the statute. It was in almost as good a place; but, as was said in argument, a deck usually extends to the sides of the ship, and a house, with windows, is of a different construction, and, as the event proves, somewhat less secure. But this point need not be decided, because there was not enough bread provided. It cannot well be maintained that the voyage from Callao to Gibraltar is less than three Atlantic voyages;— the answer says between two and three—and there were twenty-three persons on board the ship. The answer puts the amount of bread at a little more than would be necessary for one voyage, and supposing bread to have been impossible to obtain, which the evidence perhaps tends to show, though not very clearly, and assuming that this would be a valid excuse, and counting flour to be a substitute, the amount of both stated in the answer is scarcely more than enough for two Atlantic voyages. I consider that the substitution of flour, which is cooked by the ship's cook into good and wholesome bread, may be a substitute for ship-bread. The intimation of Judge Sprague to the contrary was in a case where the flour itself was served out to the men, and it did not appear that they could prepare it conveniently: Foster v. Sampson [Case No. 4,982].

All the evidence shows that after the disaster the men were on allowance of bread while it lasted, and afterwards of flour, some witnesses say a pound, and some less. Judge Sprague has decided, and Judge Betts has expressed the opinion that while the navy ration is the usual standard for bread or meat, yet if there is a want of other articles, the deficiency ought to be made up in bread or meat. Which means, I suppose, that there is no absolute standard of quantity for those articles taken by themselves, and while somewhat less than the navy ration of bread, for instance, may do when there is abundance of other vegetable food, somewhat more must be given when there is a want of other things. And in this case it is clear that there was a short allowance in this sense, for about sixty days. If this could be attributed to the storm alone, it ought not to be visited upon the owners; but the statute requires very great quantities to be laid in, with a view partly to provide for accidents and contingencies, and if the requisite quantity of bread had been provided, there is every reason to believe that enough would have escaped injury to leave ample provision for the remainder of the voyage, since only a part of the bread in the locker and none in the poop was injured. Of meat the men appear to have had a pound a day throughout; and I am not prepared to say that this was short allowance to entitle the men to two days' extra pay, for that and bread too. The rule in this district, affirmed by the circuit court, is that every day's short allowance of each of the three articles mentioned in the statute entitles the men to a day's wages; that is, two days' wages for each day that two are short, and so on: Collins v. Wheeler [Id. 3,018]. But when the short allowance is general, and not specially of meat, but of beans, rice, &c., I do not consider it just to say that they are short of both bread and meat, when an extra allowance of bread would have sufficed to prevent their suffering. Of animal food they had all that the navy ration calls for; of bread or its substitute, it is doubtful whether they had even that, and at any rate they

had less than they ought to have had in the dearth of other articles. This is shown, among other things, by the captain's intention to put into Pico or Madeira had the wind and weather permitted; and indeed by the fair preponderance of all the evidence.

It seems to me, therefore, that the libellants, excepting Gardner and Peterson, are entitled to four months' extra wages; two for their discharge at Valencia, and two for short allowance of bread. Gardner has been paid, since action brought, a sum which he accepted with the advice of his proctor in full settlement. I do not feel at liberty to disturb such an arrangement. Peterson is not, in the language of the act of 1803, "designated on the list" as a citizen of the United States, but as living in Denmark. He shipped at Callao for Gibraltar and a port of discharge, and was discharged by the consul at Valencia, who certifies that he has been fully paid. If one so shipped were proved to be, in fact, a citizen of the United States, the contract might not in all cases be conclusive against him; but if a foreigner serves from one foreign port to another, perhaps to his own home, on an American ship, I do not know why he should demand payment beyond his contract for being discharged there, even if he in fact wishes to go to the United States. He can only have damages for the short allowance. Decree accordingly.