## BROUX et al. v. THE IVY.

(District Court, D. Delaware. July 26, 1894.

SEAMEN—COMPENSATION FOR SHORTAGE OF PROVISIONS — INVALID CONTRACT—ESTOPPEL.
    Notwithstanding the adoption by shipping articles of the statutory scale for provisions (Rev. St. § 4612), the master issued provisions according to a "method" of his own, whereby there was a shortage of bread. The seamen protested, and the statutory scale was followed for a few days, but they were dissatisfied with the manner in which the provisions were weighed and served under this scale, and asked the captain to return to his "method," which he consented to do on condition that they would "agree to be perfectly satisfied in the future, and make no more complaints," and an agreement to that effect was entered on the log. *Held*, that the contract was void as being one-sided and without consideration, and did not estop the seamen from suing for the extra compensation allowed by Rev. St. § 4568, in cases of shortage.

This was a libel by Theophile Broux and others against the ship Ivy for compensation for shortage in the provisions issued to libelants as seamen on said ship.

John A. Toomey and Bradford & Vandegrift, for libelants.
Levi C. Bird, for respondent.

WALES, District Judge. This suit is brought by Theophile Broux and 16 others against the American ship Ivy, and all persons intervening, to recover extra wages on account of a reduction in the allowance of provisions which were issued to the libelants while serving on board the said ship during her voyage from Vancouver, B. C., to Wilmington, Del., between April 22 and August 29, 1893, lasting 128 days. The libelants demand this extra compensation under section 4568 of the Revised Statutes of the United States, which is in these words:

"Sec. 4568. If, during a voyage, the allowance of any of the provisions which any seaman has, by his agreement, stipulated for, is reduced, except in accordance with any regulations for reduction by way of punishment, contained in the agreement, and also for any time during which such seaman willfully, and without sufficient cause, refuses or neglects to perform his duty, or is lawfully under confinement for misconduct, either on board or on shore; or if it is shown that any of such provisions are, or have been during the voyage, bad in quality and unfit for use, the seaman shall receive by way of compensation for such reduction or bad quality, according to the time of its continuance, the following sums, to be paid to him in addition to and to be recoverable as wages: First. If his allowance is reduced by any quantity not exceeding one-third of the quantity specified in the agreement, a sum not exceeding fifty cents a day. Second. If his allowance is reduced by more than one-third of such quantity, a sum not exceeding one dollar a day. Third. In respect of bad quality, a sum not exceeding one dollar a day. But if it is shown to the satisfaction of the court before which the case is tried, that any provisions, the allowance of which has been reduced, could not be procured or supplied in sufficient quantities, or were unavoidably injured or lost, and that proper and equivalent substitutes were supplied in lieu thereof, in a reasonable time, the court shall take such circumstances into consideration, and shall modify or refuse compensation, as the justice of the case may require."

Fourteen of the libelants signed the shipping articles, at Vancouver, as able-bodied or ordinary seamen. Of the three remaining libelants, one served as cook, one as cabin boy, and one as second mate who was, before the end of the voyage, disrated and sent forward. The whole number of persons on board the ship, including officers and men, was 21. The officers, including the cabin boy, took their meals in the cabin, and were well supplied with a variety of food, besides the bread, beef, pork, and soup which they had from the general ship's stores in common with the crew. By the shipping articles the crew promised "to conduct themselves in an orderly, faithful, honest, and sober manner," and the master agreed to pay them their stipulated wages, "and to supply them with provisions according to the annexed or above scale," which was incorporated into and made a part of the shipping articles, and is established by section 4612 of the Revised Statutes, and called in the testimony "the government scale." By this scale the crew were to receive one pound of bread per day, one and a half pounds of beef

four times a week, and one and a quarter pounds of pork, one-half pound of flour, and one-third pint of peas three times a week. It was also stipulated that one pound of potatoes, one-half pound of flour or rice, one-third pint of peas, or one-quarter pint of barley might be substituted for each other. When fresh meat was issued the proportion was to be two pounds per man per day, in lieu of salt meat; and flour, rice, and peas, beef and pork, might be substituted for each other. But bread was made indispensable, for which no substitute or equivalent was allowed. The allegations of the libel are that there was a shortage, during the entire voyage, of at least one-third in the quantities of the provisions to which the libelants were entitled; that such shortage was not by way of punishment for any misconduct or neglect of duty on the part of libelants, nor because provisions could not have been procured, or were unavoidably lost or injured in the voyage; that the libelants repeatedly complained to the master of the insufficiency of the food, but, although he promised to do better, he failed at any time during the voyage to give them two-thirds of their lawful allowances. These charges are denied by the master, and his denial is supported, in the main, by the first and second mates and by the carpenter. But, without going into a discussion of the evidence, it is enough to say that there is conclusive proof that there was a shortage of the three articles of bread, pork, and peas; the deficiency in the last two articles, however, was made up by lawful equivalents,—there having been a surplus of beef issued to take the place of pork, and potatoes and rice were substituted for peas when the latter gave out. It is admitted by the expert witness and accountant who was produced on the part of the defendant that the bread fell short of the standard allowance by 466 pounds. This witness arrived at his conclusions by taking the quantities of the different provisions which were on board of the ship at the beginning of the voyage, and deducting therefrom the quantity of each kind remaining unconsumed at the end of the voyage. It is claimed on the other side that the bread shortage was upwards of 900 pounds, and I am inclined to believe that it was nearer the latter weight. The captain says that he did not issue the daily allowance of food according to the government scale, but fed the crew by his own method, up to the 15th of June, when they made a formal complaint of not getting enough, and requested to be allowed the quantities fixed by law. The captain professes to have complied with this request for a few days,—until the 18th of June,—when the libelants asked him to return to his "method," which he consented to do on condition that the libelants would "agree to be perfectly satisfied in the future, and make no more complaints." An agreement to this effect was entered on the log book and signed by 14 of the crew. The libelants became dissatisfied with the manner in which the provisions were weighed and served out to them under the government scale, and there is evidence to the effect that the captain designedly made this mode of issuing the provisions as inconvenient and troublesome as he could. At all events, he was not in favor of it. In the course of his testimony the captain

said that he had no regular scale of his own made out, but fed his crew according to the method which he had used ever since the law came in force, and that he never gave any one, except the cook, authority to supervise the provisions, either as to quantity or quality. The cook testifies that he was forbidden by the captain from giving the men their full allowance of ship bread from the first to the last of the voyage. Kelly, the first mate, uses very guarded language in answering the question:

"Q. Judging from what you saw,—judging as best you could,—what would you answer: that they did get a pound of bread or biscuit, or not? A. Judging from what I saw, they had about the average of what others get on American ships, especially on long voyages."

The hard tack on board did not exceed 850 pounds, and, allowing one pound per day for each person on board the ship, would not hold out for one-third of the voyage; and the deficiency does not appear to have been made good by the quantity of soft bread which was made by the cook and issued to the men. The captain appears to have been determined to have his own way in dispensing food to his crew, and without reference to the government scale. In this he was in fault. His treatment of the libelants in other respects is not complained of, except by Goldspring, the second mate, who was disrated for alleged neglect of duty and general incompetency, and who frankly acknowledged his dislike of the captain, and his desire to see the present suit succeed. If the testimony of Goldspring stood alone, it might not, perhaps, be of much avail, on account of his hostile relation to the captain; but he is confirmed by the other libelants, whose testimony, with one exception, and notwithstanding the exuberant expressions used by some of them, is fairly entitled to belief. Biedermann, who was the cabin boy, and was dismissed and sent forward on account of his filthy habits and insolence, is discredited by his own testimony and by that of Smith, who succeeded him in the cabin. The libelants admit that the provisions were of average good quality. The complaint is limited to the shortage, and as to this the proof preponderates largely against the defendant in reference to the article of bread alone. The stores of potatoes, rice, and peas were all consumed a short time before the ship arrived at her destination. Considerable quantities of beef, pork, and flour were left over,—sufficient, perhaps, to have lasted, if the voyage had been prolonged, for a few weeks; but, as has already been remarked, a surplus of meat or of other provisions will not make up for the want of bread. The Hermon, 1 Low. 515, Fed. Cas. No. 6,411; The Mary Paulina, 1 Spr. 45, Fed. Cas. No. 9,224.

The agreement of the 18th of June, to accept the captain's "method" in the place of the government scale, does not estop the libelants from prosecuting this suit. It would be a dangerous precedent for a court of admiralty to approve of any agreement of that kind between captain and crew. The captain was the monarch of the deck. He granted a statutory right to the libelants, with such hindrances as made them willing, after three days of trial, to relinquish it. The contract was one-sided, without consideration, and therefore invalid. Seamen have often been said to be the wards

of admiralty, and it is the duty of the court to protect them. Receipts or releases given by them, even with all the solemnity of sealed instruments, will have no effect, beyond the actual consideration fairly paid. The Rajah, 1 Spr. 199, Fed. Cas. No. 11,538.

The court has been asked to determine whether the libelants were in fact as well and sufficiently fed as seamen should be, in compliance with the spirit of the shipping articles; but for the purposes of this suit it is not necessary to decide that question, and if it was I should have some doubt about the proper answer. The men did not receive their allowance of pork; the shortage being 440 pounds, which was made up by the issue of beef,—a cheaper article,—although there was a barrel of pork, weighing 200 pounds, left over. The testimony has convinced me that there was a very considerable shortage in the allowance of bread, which was not, and could not be, made up by a surplus of one or more of other kinds of food.

A decree will be entered for the libelants excepting Thomas Smith, Adam Biedermann, and L. Goldspring, for bread shortage for 128 days, at 50 cents per day, amounting to $64 for each; for Thomas Smith (deducting his 21 days' service in the cabin, where he was well fed), 107 days, at 50 cents per day, amounting to $53.50; for Adam Biedermann, 21 days before the mast, at 50 cents per day, amounting to $10.50; for L. Goldspring, 22 days before the mast, at 50 cents per day, amounting to $11. Total amount, $971.