PETERSEN et al. v. J. F. CUNNINGHAM CO.

(District Court, N. D. California. November 14, 1896.)

No. 11,253.

1. SEAMEN—SHORTAGE OF PROVISIONS—ANTISCORBUTICS.
   The fact that there is a supply of limes on board a vessel, from which the crew are at liberty to help themselves, is not a compliance with the requirements of Rev. St. § 4569, which makes it imperative upon the master to serve the crew with a regular, daily allowance of antiscorbutics.

2. SAME—PENALTY.
   The penalty imposed by Rev. St. § 4569, upon the master of a vessel, for failing to serve his crew with antiscorbutics, does not inure to the benefit of the crew.

**3. SAME—SHIP BREAD—SUBSTITUTE.**
A bread or pastry composed of one-third flour and two-thirds copra (dried cocoanut) is not a proper and equivalent substitute for ship bread.

**4. SAME—PROLONGED VOYAGE.**
The usual length of a voyage by sailing vessel being 45 days, delay, by reason of bad weather or accident, prolonging the same to 59 days, does not justify the master in shortening the schedule allowance of provisions of the crew.

**5. SAME.**
Whether the failure of a master to properly provision his ship is from negligence or inadvertence is immaterial. The mere failure to furnish the crew with the scheduled allowance is actionable, and a recovery may be had unless it is satisfactorily shown that any provisions, the allowance of which has been reduced, could not be procured in sufficient quantities, or were unavoidably lost or injured, and that proper and equivalent substitutes were supplied in lieu thereof, in a reasonable time.

Libel in personam by Joseph Petersen and others, seamen of the schooner Viking, against the J. F. Cunningham Company, to recover certain penalties provided for by section 4568, Rev. St., for the failure of the master to supply the libelants with certain articles of food, as per the agreement contained in the shipping articles; also to recover for failure of master to serve lime juice, sugar, and vinegar as required by section 4569, Rev. St.

H. W. Hutton, for libelants.
Andros & Frank, for respondent.

MORROW, District Judge. This is a libel in personam against the owner of the schooner Viking, to recover certain penalties imposed by section 4568 of the Revised Statutes, and recoverable as additional wages, for the failure on the part of the master to supply libelants with certain articles of food as per the agreement expressed in the shipping articles. The libelants are five out of a total complement of nine men, including the captain. They shipped at the port of San Francisco, on the schooner Viking, for a round trip to Fanning Islands, in the Pacific Ocean, thence to such other foreign ports as the master might direct, and return to San Francisco for final discharge; voyage not to exceed 12 calendar months. There were also on board the captain's wife and two passengers, making twelve persons in all on board. No complaint is made by the libelants respecting the quantity or quality of the food furnished on the outward voyage to the Fanning Islands, or on the return trip until after the schooner had left Kusaie, in the Caroline Islands, which was the last touching place before the vessel reached San Francisco. The shortage is alleged to have commenced 10 days after leaving Kusaie, and to have continued substantially during the remainder of the voyage. The respective capacities of the mariners who are suing are as follows: Joseph Petersen, first mate; William Sievers, cook; John Johnson and R. Carroll, seamen; Korea Sanowski (spelled "Kortia" in the shipping articles), boy. It is to be noticed that the second mate and two of the seamen have not joined with the libelants in suing the company, nor have the two passengers who made the round trip. It is alleged in the libel that when the vessel left Kusaie she was short of provisions, having, among other things, but sufficient bread for $8\frac{1}{2}$ days; meat for 25 days; no vinegar; no peas; an insufficient supply

of sugar. It is further averred: That an abundance of each of these articles of food could have been obtained at the port of Kusaie. That, during the last portion of the voyage from Kusaie to San Francisco, the allowance of bread served to libelants was not more than an average of one-half pound per day, and that no substitute was given. No sugar was served, to be used with the lime juice. Lime juice was served but 3 days. The meat served libelants was reduced to more than one-half the amount allowed by law. No peas were served. No vinegar was served. The bread served for 41 days of the voyage was composed one-third of flour and two-thirds of copra; the latter being, it is alleged, an article unfit for human food. The sugar was reduced by more than one-third the amount allowed by law. No substitutes were given for the articles of food so short as aforesaid. The prayer of the libel asks for the penalties imposed by section 4568, according to the short or non allowance, as the case may be, of the articles of food referred to, and also that the same penalty be imposed and awarded to the libelants, as additional wages, for the failure of the master to serve the lime juice, sugar, and vinegar as required by section 4569, Rev. St. U. S. The answer admits that the allowance of bread was somewhat shortened, but denies that any of the other articles of food were insufficient in quantity. It justifies the reduction of the regular statutory allowance of bread on the ground that the vessel was delayed for a period of 18 days by reason of the running ashore of the vessel near Kusaie, and her return to that place for repairs, and a subsequent further delay of 20 days during the voyage because of adverse winds and tempestuous weather. It is claimed, however, that an equivalent and proper substitute was given. Section 4568 of the Revised Statutes, under which the libel is brought, reads as follows:

"If, during a voyage, the allowance of any of the provisions which any seaman has, by his agreement, stipulated for, is reduced, except in accordance with any regulations for reduction by way of punishment, contained in the agreement, and also for any time during which such seaman willfully, and without sufficient cause, refuses or neglects to perform his duty, or is lawfully under confinement for misconduct, either on board or shore; or if it is shown that any of such provisions are, or have been during the voyage, bad in quality and unfit for use, the seaman shall receive by way of compensation for such reduction or bad quality, according to the time of its continuance, the following sums, to be paid to him in addition to and to be recoverable as wages: First. If his allowance is reduced by any quantity not exceeding one-third of the quantity specified in the agreement, a sum not exceeding fifty cents a day. Second. If his allowance is reduced by more than one-third of such quantity, a sum not exceeding one dollar a day. Third. In respect of bad quality, a sum not exceeding one dollar a day. But if it is shown to the satisfaction of the court before which the case is tried, that any provisions, the allowance of which has been reduced, could not be procured or supplied in sufficient quantities, or were unavoidably injured or lost, and that proper and equivalent substitutes were supplied in lieu thereof, in a reasonable time, the court shall take such circumstances into consideration, and shall modify or refuse compensation, as the justice of the case may require."

The scale of provisions agreed to be furnished and contained in the shipping articles (which is identical with the schedule in Table A annexed to section 4511, Rev. St.), in addition to the daily issue of lime or lemon juice, sugar, and vinegar, or other antiscorbutics, as required by law, is as follows: 1 pound of bread a day; 1½ pounds of beef four

times a week; 1¼ pounds of pork three times a week; ½ pound flour
three times a week; ⅛ pint peas three times a week; ⅛ ounce tea a
day; ½ ounce coffee a day; 2 ounces sugar a day; 3 quarts water a
day.    This schedule of provisions is to be furnished to each member
of the crew.    Certain substitutes are, however, provided for, as fol-
lows:

"One ounce of coffee, or cocoa or chocolate may be substituted for one-quarter
ounce of tea; molasses for sugar, the quantity to be one-half more; one pound of
potatoes or yams; one-half pound flour or rice; one-third pint of peas or one
quarter pint of barley may be substituted for each other. When fresh meat is is-
sued, the proportion to be two pounds per man, per day, in lieu of salt meat.
Flour, rice, and peas, beef and pork, may be substituted for each other, and for
potatoes onions may be substituted."

It may be observed here that no claim is made with reference to the
quantity or quality of coffee, tea, or water supplied.

Two questions arise under the facts of this case:    First, whether
the schedule of provisions referred to, or the substitutes, were fur-
nished; second, whether any shortage or reduction in the scheduled
allowance was. justified.    The testimony is contradictory.    That
given by most of the libelants is evidently somewhat exaggerated.
This is particularly true of the cook's testimony.    That there was
a general shortage in the provisions is, I think, clearly established
by the testimony.    But that the shortage was such as to cause any
particular suffering, or even great personal discomfort, to the libel-
ants is doubtful.    It appears that the voyage was an unusually long
one.    It was testified that the ordinary length of time for the voyage
from Kusaie to San Francisco would be from 40 to 45 days.    The
voyage in question consumed 59 days.    The vessel first left Kusaie,
in the Caroline Islands, to return to San Francisco, on February 14,
1896; but she ran on a reef, and was compelled to put back to
Kusaie for repairs, which detained her some 18 days.    After her
second departure from Kusaie, on March 7, 1896, she encountered
adverse winds and gales,·which, so the captain claims, protracted
the voyage some 20 days longer than would otherwise have been con-
sumed.; · The vessel was provisioned at San Francisco for the round
trip.    She carried a mixed cargo of general merchandise and lum-
ber, among which were such articles of food as bread and beef.    All
of the cargo delivered at Kusaie was consigned to one trader there,
—in fact, the only one at that place.    A cargo of copra—dried cocoa-
nut—was taken on board at·Kusaie.    The cook testifies that he
called the master's attention to the fact, before departing from
Kusaie, that the ship's stores were short.. The captain admits that
he was somewhat in need of provisions,—that is, the scheduled pro-
visions,—and claims to have made some effort to procure additional
supplies from the trader.    In this attempt he states that he was only
partially successful.    But, in spite of an additional supply of pro-
visions, the captain found it prudent and necessary to shorten the
allowance of his provisions some 10 days after leaving Kusaie the
second time.    The cook claims that everything was shortened, and
his testimony and that of the other libelants, excepting the mate,
would lead one to believe that the crew actually suffered from star-
vation.    The testimony of the first mate, who is one of the libelants,

and at the time of testifying was the master of the schooner, is more reliable. It appears from his testimony that the principal trouble lay with the shortage of bread. Without rehearsing in detail the testimony of the various witnesses as to the quantity of each disputed article furnished, I may say that in my opinion the salt beef, pork, and peas supplied were adequate, and, if not within the scheduled allowance, were at least substantially so near thereto as not to furnish any reasonable basis for the imposition of the penalty provided by section 4568, Rev. St. The principal question is with respect to the bread and sugar, and also the vinegar, lime juice, and sugar to be served therewith, as required by section 4569, Id.

With reference to the vinegar, lime juice, and sugar to be served with the latter, very little need be said. These are required to be supplied and served to the crew by section 4569, Rev. St., as follows: Lime juice and sugar daily at the rate of half an ounce each per day, and vinegar weekly, at the rate of half a pint per week, for each member of the crew. The testimony shows that no lime juice was served, excepting during the last three days before reaching San Francisco, nor was any sugar served with the lime juice, and no vinegar was served. The captain claims, with respect to the lime juice, that the crew received a proper substitute, viz. limes, which were shipped at Kusaie. In this he is corroborated by the passenger who testified. While there were limes on board, sufficient, perhaps, to last the entire voyage, still it does not satisfactorily appear that the master ever served the crew with them. It may be that the libelants were free to help themselves whenever they chose or felt inclined to do so, but can this be said to constitute a compliance with the provisions of section 4569, Id.? That section makes it the imperative duty of the master to supply the crew with a regular daily allowance of lime or lemon juice, and also sugar and vinegar, or other antiscorbutics, to be served in the proportions referred to above. For failing to serve this lime juice, sugar, and vinegar, or other antiscorbutics, the statute imposes a penalty upon the master, but this penalty does not inure to the benefit of the crew; nor is it provided that they shall recover any penalty, in the way of additional wages, for the master's omission in this respect. As said by Judge Hoffman in The Rence, 46 Fed. 805, in speaking of the duty imposed by the statute upon the master to serve lime juice, etc., and the penalty for a failure to do so:

"The provisions of the statute in this respect are mandatory, and the captain will be liable to the infliction of a fine, if convicted of an omission to comply with his duty in this respect, even though the omission should be followed by no ill consequence to the crew. In this penalty, however, the seamen have no interest."

Section 4569 differs in this respect from section 4568. The latter section specifically provides for a penalty which shall inure to the benefit of the crew, and be recoverable as additional wages at so much per day. Nor can the penalty provided for in section 4568 be made applicable, by implication, to section 4569. The former statute relates exclusively to the failure of the master or owners to supply the crew with the provisions stipulated for in the shipping articles, while the latter statute relates only to the failure of the

master to serve the crew with antiscorbutics, and the failure to have on board a medicine chest, medical stores, lime juice, etc. The libelants have therefore mistaken their remedy, when they seek to avail themselves of the penalties provided for by section 4568, for violations by the master of the requirements of section 4569, relating to lime juice, sugar to be served therewith, and vinegar, or other antiscorbutics. The claims for the failure of the master to serve them with lime juice, sugar, and vinegar will, therefore, be disallowed and denied.

We now come to the question as to the allowance of bread. The captain admits a shortage in the bread allowance, but, as we have seen from the averments of the answer, claims that a proper and equivalent substitute was furnished. This substitute consisted in mixing copra—dried cocoanut—with flour. The proportions to which the cook testified were one-third flour and two-thirds copra. The libelants testify that this cocoanut bread did not answer the purpose of an equivalent and adequate substitute for bread, and that it produced a sort of diarrhea, besides having a debilitating effect. The captain, his wife, and the passenger who testified state that this combination of flour and copra made a very palatable kind of bread. It is very doubtful, however, whether bread composed one-third of flour and two-thirds of dried cocoanut, while it may make a very palatable pastry, is a sufficient and proper substitute for the more nourishing and stable article of bread called for by the statutory schedule. One of the seamen sworn for the respondent admits that the reduced allowance of biscuits—two one day and three the next— was not sufficient for him. He himself appears, according to the testimony of some of the libelants, to have entered a complaint with respect to the sufficiency of the food, but in his testimony he claims that this complaint was made simply as to one meal; that he had been detained at his post by reason of the fact that the mate did not relieve him in time, and that some one else had meanwhile eaten his dinner. The entries in the log book bear out the fact that there was a shortage of bread and flour (entry of March 24th), and that copra was used with the food, and that they were getting short of everything (entry of April 15th). Following this last entry are the entries of April 16th, 17th, 18th, 21st, 22d, 23d, 24th, to the effect that the crew were employed in peeling copra. On the 25th of April the bark J. A. Falkenberg was sighted and spoken, and the captain procured some provisions from the master of that vessel, which relieved, to some extent, the wants of the crew. Among these provisions were two sacks of flour. Ten days after meeting with the bark, the Viking arrived in San Francisco. This was on the 5th of May, 1896. It is to be observed that the scale of provisions required by the schedule does not mention any substitute for bread. No substitute or equivalent seems to be contemplated. As was said in the case of Broux v. The Ivy, 62 Fed. 600, 603, where a shortage of bread was involved:

"Considerable quantities of beef, pork, and flour were left over,—sufficient, perhaps, to have lasted, if the voyage had been prolonged, for a few weeks; but, as has already been remarked, a surplus of meat or of other provisions will not make

up for the want of bread;" citing the cases of The Hermon, 1 Low. 515, Fed. Cas. No. 6,411, and The Mary Paulina, 1 Spr. 45, Fed. Cas. No. 9,224.

In The Hermon it was considered that the substitution of flour, which is cooked by the ship's cook into good and wholesome bread, may be substituted for ship bread. In The Mary Paulina it was said that no "overabundance of meat, fresh or salted, can be substituted for the bread required by, the statute" (referring to the statute of July 20, 1790, § 9; 1 Stat. 135). The cook swears that the first tin of biscuit lasted 8 days, and that they were allowanced after that, only one tin remaining. He admits, later on in his testimony, that the reduction in the regular allowance commenced 10 days after leaving Kusaie, when a general reduction was made. The testimony of the other libelants is to the effect that the reduction first began 10 days after leaving Kusaie, and that it continued, substantially, until the vessel reached San Francisco. The libelants were therefore without the regular and scheduled allowance of bread for a period of 49 days. I further find from the testimony that such insufficiency in quantity exceeded one-third of the scheduled allowance, and that the substitute served, composed of flour and copra, was not a "proper and equivalent" one. The statute imposes a penalty "not exceeding one dollar a day." This gives the court a discretion as to the amount to be imposed. I shall award the sum of 75 cents a day for the period of 49 days to each of the libelants, making a total sum of $183.75 for the short allowance of bread.

We next take up the question of the amount of sugar served. The cook swears that there were about 50 pounds on board when the vessel left Kusaie; that the allowance was reduced 10 days out from that place; that it lasted about 20 days, when molasses was served as a substitute; that there were only $2\frac{1}{2}$ gallons of molasses on board; that it lasted until the vessel arrived at San Francisco. No sugar was procured either at Kusaie, or from the bark J. A. Falkenberg. The scheduled allowance of sugar is 2 ounces per day to each member of the crew, and it is provided that molasses may be substituted for sugar, the quantity to be one-half more. There should have been on board, to last the entire voyage of 59 days, when the vessel sailed from Kusaie, $87\frac{1}{4}$ pounds of sugar. Instead of that, there was, as we have seen, but about 50 pounds,—a deficiency of more than one-third the quantity required by the statute. Making due allowance for the use of the molasses as a substitute for the sugar, I find that the allowance of sugar was reduced by more than one-third of the scheduled quantity, and for a period not exceeding 29 days. I shall allow a penalty of 75 cents per day to each of the libelants, making a total sum of $108.75.

Respecting the second contention of respondent, that the master was justified in reducing the quantity of scheduled articles of food complained about, for the reason that but little could be procured at Kusaie, and because of the unavoidable delays encountered, it does not appear from the evidence that there is any real, substantial excuse for having run short of the scheduled articles, found to have been shortened, to the extent to which it occurred on the voyage in question. It is true that the voyage, by reason of running on a reef near Kusaie, and because of adverse winds and weather, was

considerably prolonged.    But I do not think it was protracted to such a period as can be deemed a justification of the course pursued by the master of this vessel.    The master of a vessel—particularly of a sailing vessel traveling to localities and ports not much frequented by vessels and traders—must not only be adequately supplied with provisions for his crew to last the ordinary voyage, but he is under the duty of preparing reasonably, to some extent, for the exigencies and necessities of a longer voyage than is expected or is usual.    Navigation by sail, even to-day, is more or less uncertain, so far as speed and duration are concerned; and it will continue to be so until human ingenuity can discover some means of controlling or anticipating the condition of the elements, upon which the locomotive power of a sailing vessel alone depends.    It is true that, where the voyage is prolonged beyond all reasonable expectation, the master will be justified, when no additional supplies can be procured, in reducing the allowance of food.    As, for instance, was done in the case of Ferrera v. The Talent, Fed. Cas. No. 4,745.    There the ordinary length of the voyage was 50 days, whereas the particular trip in question consumed 104 days,—over double the usual time.    It was held that this extraordinary delay at sea justified a reduction in the allowance.    I do not think that the length of the voyage of the Viking in this case—a period of 59 days—brings it within the rule of necessity.    It was at best but 14 days more than the average trip of 45 days.    My conclusion upon this phase of the case is that, while the voyage was considerably delayed, still it was not so greatly and unavoidably prolonged as to justify the master in reducing the allowance of food to his crew, so far as I find that they were in fact reduced; in other words, the master should have had sufficient to last the entire voyage.

The final claim is made by the respondent that the master made every reasonable effort to procure additional provisions from the only trader at Kusaie.    There is some conflict in the testimony as to whether the master could not have procured more than he really did. He says he delivered, as part of his cargo, 100 tins of bread to Milander, the trader, and that he could only get back 6 tins of bread and some other supplies.    His testimony in this respect is as follows:

"Before sailing I spoke to Captain Milander, the trader, and told him I was rather short, and asked him if he could help me any. He made considerable of a kick about it, and said that we had brought him provisions to trade with; that he had no other means of getting provisions, and we had disappointed him on our last voyage in about two months, so that when we arrived there there was nothing in the store, and that he had no assurance but what we would do the same thing again; that he had traders among the Caroline Islands he had to supply; that his only means of procuring provisions was through us, and, if he could not supply his traders, they would go to some one who could supply them. The Germans were his competitors there."

Further on in his testimony the master states that he managed to get 6 tins of bread out of the 100 he had delivered to Milander.    Each tin contained 50 pounds, making a total of 300 pounds.    Besides this, he says he got other supplies, which it is not necessary to specify. It does not appear, however, that he obtained any sugar.    I am not entirely satisfied whether the master's statement as to what he received from Milander is absolutely correct.    I doubt whether he

succeeded in getting the six tins of bread. A list of provisions on board was taken, when the vessel left Kusaie, by the cook, and this was entered in the log book by the mate. It only refers to two tins of bread, which the cook says is all that was on board. It is certainly singular that the captain, who had undoubted access to, and presumably consulted, his log, did not notice this entry, and, if it be true that he had six tins instead of two on board, did not correct it. Again, it is difficult to understand why, if the captain did procure six tins of bread at Kusaie, the allowance should have been reduced when only ten days out from the latter place. The mate says that another vessel arrived at Kusaie while the Viking was still there, and that she had provisions on board, and that he saw some of them landed. The captain states that this vessel had no stores, but only merchandise. However this may be, the computations I have made show that, even had not the schooner been delayed, she did not have sufficient bread or sugar to last for an ordinary trip, viz. from 40 to 45 days. I cannot but conclude that there must have been some negligence or inadvertence on the part of the master or owners with respect to the provisioning of the vessel. But whether this failure arose through negligence or inadvertence is immaterial, so far as the recovery of the penalty provided for by section 4568 is concerned. The mere failure to furnish the crew with the scheduled allowance is actionable, and a recovery may be had, unless it can be shown to the satisfaction of the court that any provisions, the allowance of which has been reduced, could not be procured or supplied in sufficient quantities, or were unavoidably lost or injured, and that proper and equivalent substitutes were supplied in lieu thereof, in a reasonable time, in which event the court may modify or refuse compensation as the justice of the case may require. No such showing, as indicated, to the satisfaction of the court, can be said to have been made in this case. The statute was enacted for the benefit of our merchant seamen. It was designed to prevent famine on board vessels at sea, and to preserve the health of the crew. In the case of The Mary, 1 Ware, 465, Fed. Cas. No. 9,191, Judge Ware, in an action similar to that in this case, but brought under section 9 of the act of July 20, 1790 (1 Stat. 135), which is somewhat different from the present law as contained in section 4568 of the Revised Statutes, said that, where the master found himself in a port where he could not procure provisions of the amount and description directed by law, other articles might be substituted which are of equivalent value; that this temperament in the construction of the statute had been introduced upon the reasonable presumption that the law did not intend to require of the master impossibilities, but that the courts were bound to see that the substitutes offered were a full equivalent, both in quantity and quality, for that required by the text of the law—

"The more so as the policy of the law addresses itself so strongly to the interests of humanity, it being intended to guard against the dreadful sufferings of famine while the ship's company are isolated from all the world, and under a positive impossibility of relieving themselves."

Again, the same learned judge observes, in applying the law to the facts of the case he was then considering:

"I have no doubt that it was owing to unexpected contingencies that the vessel was left with this short supply of provisions, and not to the want of ordinary prudence or forecast on the part of the owners. Their intention was to have had an addition made to her stores for the return voyage, in a foreign port. But unfortunately, and without any fault on their part, they could not be obtained. A court, however, which is bound to administer the law, cannot take those circumstances into consideration. The text of the law is imperative, and it is framed in the spirit of wisdom and humanity; and the interests of commerce, as well as humanity, require that it should be carried into effect."

Upon the whole of the case, while, as stated, I do not think the libelants suffered to any great degree, and could not recover damages for suffering endured by reason of hunger, and for injuries to their health thereby, still they have brought themselves within the terms of section 4568, Rev. St. U. S., with respect to the short allowances of bread and sugar. Let a decree for libelants be entered in accordance with this opinion.