# Case No. 11,538.

## The RAJAH.

[1 Spr. 199; 1 15 Law Rep. 208.]

District Court, D. Massachusetts. March, 1852.

SEAMEN — WAGES — RECEIPTS — HOW TREATED IN ADMIRALTY.

1. Courts of admiralty deal with claims by seamen for compensation of marine services, in the nature of wages, in a manner different from that in which courts of common law treat ordinary transactions.

[Cited in McCarty v. The City of New Bedford, 4 Fed. 828.]

2. Receipts or releases given by seamen, even with all the solemnity of sealed instruments, will have no effect, beyond the actual consideration fairly paid.

[Cited in Broux v. The Ivy, 62 Fed. 604.]

This was a libel [against the bark Rajah, Wilcox, claimant] by a seaman for his share or lay in a whaling voyage.

A. Mackie, for libellants.

T. G. Coffin, for respondents.

SPRAGUE, District Judge. I have not thought it necessary to look at this case as an ordinary transaction, between merchant and merchant, which is the aspect in which the learned counsel for the respondent has presented it. It is a claim by a seaman, for compensation for marine service, in the nature of wages, and the admiralty deals with contracts respecting such service or compensation, differently from the manner in which a court of common law can treat ordinary transactions.

Seamen have been called the wards of the admiralty, and it habitually exercises a degree of guardianship over them, for their protection. It scrutinizes all contracts respecting their services or wages, in order to see that advantage has not been taken of their necessities, ignorance, or thoughtless improvidence. Thus, where contracts have been made, by which seamen have agreed not to receive any wages, unless the ship should safely return to her home port, although freight should be earned on the out-

1 [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

ward voyage, courts of admiralty have set them aside. This was the case in Johnson v. Sims [Case No. 7,413] and The Juliana, 2 Dod. 504, where the agreement was inserted in the shipping articles; and in Buck v. Rawlinson, 1 Brown, Parl. Cas. 137, where the contract was by a separate bond, given to the master. So an engagement by a seaman. that the expenses of curing, in case of sickness, should be deducted from his wages, has been set aside.

Receipts or releases given by seamen, even with all the solemnity of sealed instruments, will have no effect beyond the actual consideration fairly paid. This is shown by many cases, and particularly in The David Pratt [Case No. 3,597]. Judge Story, in Brown v. Lull [Id. 2,018]. has examined such contracts with seamen, and declared that they cannot be sustained, unless it shall appear that they were fully explained and understood by the seamen, and a fair and adequate consideration received for every right renounced, or obligation assumed. He holds the following language: "Seamen are a class of persons remarkable for their rashness, thoughtlessness and improvidence. They are generally necessitous, ignorant of the nature and extent of their own rights and privileges, and for the most part incapable of duly appreciating their value." See, also, Piehl v. Balchen [Id. 11,137]; The Sarah Jane [Id. 12,348]; The Cadmus v. Matthews [Id. 2,282].

And again he says: "Courts of admiralty on this account are accustomed to consider seamen as peculiarly entitled to their protection; so that they have been, by a somewhat bold figure, often said to be favorites of courts of admiralty. In a just sense they are so, so far as the maintenance of their rights, and the protection of their interests, against the effects of the superior skill and shrewdness of masters and owners of ships. are concerned. Courts of admiralty are not. by their constitution and jurisdiction, confined to the mere dry and positive rules of the common law. But they act upon the enlarged and liberal jurisprudence of courts of equity." And he subsequently declares. that whenever a new stipulation is found in the shipping articles, derogating from the general rights and privileges of seamen, courts of admiralty hold it void, unless two things concur, "first, that the nature and operation of the clause is fully and fairly explained to the seamen; and, secondly, that an additional compensation is allowed, entirely adequate to the new restrictions and risks imposed upon them thereby." Nor is this doctrine confined to dealing between seamen and the owners or masters, but extends to contracts with other persons respecting their compensation or wages; as, for example, sales of shares or prize-money, which Judge Story, in the same case, adverts to in the following language: "I know not, indeed, that this doctrine has ever been broken in upon in courts of admiralty, or in courts of equity. The lat-

ter courts are accustomed to apply it to classes of cases far more extensive in their reach and operation; to cases of young heirs selling their expectancies; to cases of reversioners and remainder-men dealing with their estates; and to cases of wards dealing with their guardians; and above all, to cases of seamen dealing with their prize-money and other interests." These principles are sustained also by a very able and elaborate opinion of Lord Stowell, in The Juliana. 2 Dod. 504. See, also, 1 Story. Eq. Jur. §§ 331–340; Curt. Merch. Seam. 43.

Let us now advert to the facts of the present case. The libellant, Dray, served on board the whale-ship Rajah, from the 23d November, 1848, to 10th June, 1851, at the lay of 1/140, and the balance due to him at the termination of his voyage amounted to $154.73, which he now claims. The owner objects to paying that amount, or any part thereof, on the ground that the libellant has transferred his whole claim to Mead & Co., by means of the order which has been presented and accepted.[2] That order is not a negotiable instrument, and it is not contended that it can operate further than as an assignment of the fund in the hands of the owner, the whole amount of which he still retains, nothing having been paid on the order. Soon after the order was given, Dray gave notice to Wilcox, the owner, not to pay it to Mead & Co., and requested payment to himself. The order bears date the 10th June, 1851, and has written on it the word "Entered" and also the words "Accepted, 6 Mo. 12th, 1851." Wilcox, the owner, in his answers to the interrogatories, says, that he first saw the order on the 10th June, then finding it at his place of business, where it had been previously left; that he considered it accepted from the time he saw it; that he cannot say on what day the words "Accepted, 6 Mo. 12th" were written; they were intended to represent the day when he considered it accepted, and that such acceptance was before he saw Dray. An interrogatory was distinctly put to Wilcox, whether he wrote those words before Dray forbade his paying, and from the answer, which seems to have been carefully prepared, I cannot be satisfied that they were written before he received notice not to pay the order, but, looking also at other circumstances, believe that they were written afterward. It appears, by the answer of the owner, that the libellant demanded payment, and offered a bond of indemnity, which was declined, unless he would get the president of the United States

as surety; that is, the owner absolutely refused, but has chosen to aid Mead & Co. in their controversy with the libellant, and for that purpose lent his name to them, to carry on this suit for their own benefit. Mead & Co. are the real party respondent, and the court is bound, therefore, to look into the transaction between them and the libellant. It appears, by the evidence, that Mead & Co. are what in New Bedford are called "fitters," that is, persons that furnish supplies to seamen, on going upon, or returning from, whaling voyages; that this class of traders employ runners to solicit trade; that, on the arrival of a whale-ship, from twenty-five to one hundred of these runners come on board, to solicit the seamen, before they have opportunity to go on shore; that, on the arrival of this bark Rajah, the libellant was induced by a runner of Mead & Co. to go directly from the vessel to their store; there he was supplied with clothing to the amount of $28.37, watch and chain $30, and $2 in cash, which, with a charge of fifty cents for boating in bringing him on shore, amounted to $60.87; and thereupon, an order for the whole proceeds of his voyage, expressed to be for value received, was given; and thus, in one hour after landing from a whaling voyage of more than two-and-a-half years' duration, he was induced to transfer to a stranger, his whole remaining claim for his long and laborious services. The amount of that claim, as we have seen, was $154.73. He had received from Mead & Co., at most, only $60.87. Why was an instrument taken from him, operating as a transfer of the whole? The reason given in the answer of the owner, is, that Mead & Co. promised him to pay to him in clothing from their store, for the residue which they should receive, above the amount then furnished. If this were so, the libellant had divested himself of all control of the proceeds of his voyage, and placed himself so far in the power of Mead & Co. that he could claim nothing from them, but a further supply of clothing, and this, too, when he had received only two dollars in cash for the supply of all his other wants. It is true, that afterwards, on the 11th, Mead & Co. let him have money to the amount of $10; and on the 12th, $16.75 more. But, if the answer is to be taken as true, this was voluntary on their part, and not by virtue of any obligation which they were under; and the validity of the order is to be tested by the agreement under which it was given. No satisfactory reason has been assigned, why Mead & Co. should have taken an assignment of a cash fund, to an amount greater than the supplies furnished at the time, and the court can perceive no reason, unless it was intended to tie up the hands of the libellant, so that he could receive the residue only through Mead & Co., and in such manner as they should see fit. I have no hesitation, therefore, in saying, that neither the owner, who has lent his name as a nominal

---

[2] The order ran as follows:—
    "New Bedford, 6 Mo., 10th, 1851.
"For value received, pay to Mead & Co., or their order, the net proceeds of my voyage, (including slush,) and their receipt shall be mine in full.   James Dray.
    "To the agent and owners of the Bark Rajah.     (Entered.)
  "Accepted, 6 Mo. 12th, 1851.
    "Witness:     Geo. P. Drew."

party, nor Mead & Co., the real defendants, can withhold from the libellant any greater amount than has been actually and fairly paid to him. What is that amount? The watch and chain charged in their account at $30, was returned within a few days, but they refused to take it back. It was left, however, on their counter. Two watchmakers have been called to testify what would be the retail price, affording a good profit to the vendor. One of them says $17.50, the other $20.50. This evidence is not controlled. It thus appears, that the charge was from about fifty to seventy per cent. above the fair value, and the seaman had a right to rescind the contract, within a reasonable time. This he did. Some objections were made to other items, but they were finally waived, and the residue of Mead & Co.'s account, after deducting the watch and chain, amounting to $57.62, will be allowed to them. This sum, deducted from the whole amount of the libellant's voyage, will leave $97.11, for which a decree must be entered for the libellant, with costs.