## DOMENICO et al. v. ALASKA PACKERS' ASS'N.

(District Court, N. D. California. December 9, 1901.)

No. 12,239.

1. ADMIRALTY JURISDICTION—MARITIME CONTRACTS.

A contract by men to act as seamen on a voyage to and from salmon fishing grounds in Alaska, to work as fishermen during the season, and assist in canning the fish on shore and in loading them on board for transportation, is one maritime in its nature, and which a court of admiralty has jurisdiction to enforce.[1]

2. CONTRACTS—CONSIDERATION—PERFORMANCE OF LEGAL OBLIGATION.

Where a person who has bound himself by a contract to render services refuses to do so unless paid more than the contract price, the parties may enter into a new agreement, by which an increased compensation is to be paid for the same services, and in such case' the subsequent performance of the contract by the promisee is a sufficient consideration for the new agreement.

3. SAME—VALIDITY—DURESS.

Where persons who have contracted to render services refuse, without lawful excuse, to perform the same unless paid a greater compensation, the employer has his election to sue for damages for breach of the contract, or to enter into a new and substituted contract for the payment of the compensation demanded; and the fact that the former remedy is worthless, because the employés are not able to respond in damages, and the employer is induced thereby, and to save himself from greater loss, to yield to the demands of the employés, and agree to pay a higher compensation for the same services, does not constitute duress which will render the new contract invalid.

4. CORPORATION—CONTRACTS—ESTOPPEL TO DENY AUTHORITY OF AGENT.

Where the superintendent of a canning company in charge of its plant in a distant place assumed authority to make a contract for the employment of men, and the company received and retained the benefit of the services rendered thereunder, it is estopped to deny the authority of the superintendent to make the contract.

5. SETTLEMENT—RELEASE OF CLAIM FOR WAGES—EFFECT IN ADMIRALTY.

Contracts by men to navigate a vessel to and from Alaska, and while there to work as fishermen during the season for taking and canning salmon, are not, strictly speaking, for the performance of services as seamen, and are not within the provisions of Rev. St. § 4552, which make releases executed as therein provided on settlement with seamen conclusive on the parties; and where such men, on their return, were offered less than they were legally entitled to receive under their contract, and were impelled by their necessities to accept the same, and to sign releases in full, which they did under protest, a court of admiralty will not hold them concluded by such releases, although they were signed with full knowledge of their terms.

In Admiralty. Suit to recover a balance claimed for wages.

[1] Admiralty jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347; Boutin v. Rudd, 27 C. C. A. 530.

E. J. Banning and Marshall B. Woodworth, for libelants.
Chickering, Thomas & Gregory, for defendant.

DE HAVEN, District Judge. This is a libel in personam, brought by a large number of persons to recover each the sum of $50, balance due for wages as fishermen and seamen, upon a contract alleged to have been entered into between them and the defendant corporation on May 22, 1900, at Pyramid Harbor, Alaska. The answer of the defendant sets forth three defenses: First, the defendant avers that the contract referred to in the libel is without consideration; secondly, denies that it executed such contract; and, for a third defense, it is alleged that the labor performed by the libelants was done under a contract other and different from that sued on, and that prior to the commencement of this action each of the libelants was paid the full amount due him, and in consideration thereof executed a release of all claims and demands which he had against the defendant. It appears from the evidence that on March 26, 1900, the libelants entered into a contract with the defendant, whereby they were employed to go as seamen for a voyage between San Francisco and Pyramid Harbor and return on board such vessel as might be designated by defendant; and also to work for the defendant at Pyramid Harbor during the season of that year as fishermen, "or in any other capacity"; the libelants undertaking to do "regular ship's duty both up and down, discharging and loading, and to do any other work whatsoever when requested to do so by the captain or agent of the Alaska Packers' Association." By the terms of this agreement the defendant was to pay each of the libelants $50 for the season, and 2 cents for each red salmon caught by him. On April 5, 1900, certain of the libelants signed shipping articles, by which they shipped as seamen on the Two Brothers, a vessel chartered by the defendant for the voyage between San Francisco and Pyramid Harbor, and also bound themselves to do for defendant the same work they were to perform under the previous contract; the defendant agreeing to pay each of them the sum of $60 for the season and 2 cents for each red salmon caught by him. Thereafter the libelants entered into the employment of the defendant, some under the first and the others under the second of these contracts, and proceeded on the Two Brothers from San Francisco to Pyramid Harbor, Alaska. Shortly after their arrival at that place, they became dissatisfied, and refused to further perform the services called for by such contracts, unless defendant would enter into a new agreement with them, binding itself to pay to each of the libelants for the same work the sum of $100 for the season, and, in addition thereto, the sum named in the former contracts for each red salmon caught. The defendant had $150,000 invested in the business conducted by it at Pyramid Harbor, and no other men could be engaged to take the places of libelants during that fishing season. Under these circumstances the superintendent of defendant yielded to what he deemed the unreasonable and illegal demands of libelants, and agreed in behalf of the defendant corporation to pay the additional sum demanded by them for the season's work. This

contract was entered into May 22, 1900, and is the one sued on. It was signed in behalf of defendant by its superintendent or his clerk in the following words, "By Alaska Packers' Association," and delivered by the superintendent as the contract of defendant. Upon their return to San Francisco, October 6, 1900, the defendant, through its proper officer, informed libelants that the contract of May 22, 1900, was executed without authority from defendant, and that it would not pay the increased compensation therein provided for them. After this notice, all of the libelants, and some of them after consulting counsel, accepted under protest the amount of wages stipulated for in the original agreement, and thereupon executed a release of all their claims and demands against the defendant.

1. It will be noticed that the principal subject of the contract upon the part of the libelants was for the rendition of services as fishermen at Pyramid Harbor, and included work in the cannery on shore, in preserving the fish caught by them, and also the labor of placing the fish on board the Two Brothers for transportation to San Francisco. The contract is, however, maritime in its nature. The fact that, while engaged in fishing at Pyramid Harbor, the libelants slept on shore, and mended their nets, and cared for the fish on shore, and that this was contemplated by the contract, does not make it any the less a maritime contract which a court of admiralty has jurisdiction to enforce. The Minna (D. C.) 11 Fed. 759.

2. The libelants claim that the defendant did not, as it agreed to do, provide them with serviceable nets in which an average catch of fish could be taken, and that because of defendant's default in this respect they were justified in refusing to perform their original agreement and in demanding the additional compensation provided for by the later contract of May 22, 1900. The contention of libelants that the nets provided them were rotten and unserviceable is not sustained by the evidence. The defendant's interest required that libelants should be provided with every facility necessary to their success as fishermen, for on such success depended the profits defendant would be able to realize that season from its packing plant, and the large capital invested therein. In view of this self-evident fact, it is highly improbable that the defendant gave libelants rotten and unserviceable nets with which to fish. It follows from this finding that libelants were not justified in refusing performance of their original contract. The defendant contends that, such being the fact, the contract sued on is nudum pactum; and it is urged in support of this claim that the promise of the defendant contained therein was simply a promise to pay to the libelants additional compensation for the precise work they were already under a legal obligation to perform by the terms of the prior agreement. It is an elementary principle of law that after a contract for the rendition of services or for the delivery of property has been completely executed by the party who agreed so to do, a promise made by the other to pay more for such service or property than the sum fixed by the contract performed would be without consideration. Clark, Cont. p. 192. The promise in that case would be simply a promise to make a gift, and could not be enforced. But when a contract

remains wholly or partly executory, and the party who has ·obligated himself to render services or deliver property thereunder refuses performance unless paid more than he would be entitled to receive by the terms of such contract, whether in such case the agreement of the other to pay the increased price demanded in order to obtain precisely the same service ·or property stipulated for in the original contract would be without consideration is a question upon which the courts are not agreed. The following cases may be cited as in principle holding that such agreement would be without consideration: Vanderbilt v. Schreyer, 91 N. Y. 392; Ayres v. Railroad Co., 52 Iowa, 478, 3 N. W. 522; Harris v. Carter, 3 El. & Bl. 559; Frazer v. Hatton, 2 C. B. (N. S.) 512; Conover v. Stillwell, 34 N. J. Law, 54; King v. Railway Co., 61 Minn. 483, 63 N. W. 1105; Reynolds v. Nugent, 25 Ind. 328. The doctrine of these cases is expressed in the following extract from the opinion of the court in Vanderbilt v. Schreyer, 91 N. Y. 392:

> "Pollock states the rule as follows: That 'neither the promise to do a thing nor the actual doing of it will be a good consideration if it is a thing which the party is bound to do by the general law, or by a subsisting contract with the other party.' Pol. Cont. 161; Crosby v. Wood, 6 N. Y. 369; Deacon v. Gridley, 15 C. B. 295. 'Nor is the performance of that which the party was under a previous valid, legal obligation to do sufficient consideration for a contract.' 2 Pars. Cont. 437."

On the other hand, it has been held that when one who has bound himself to render services or deliver property under an existing contract refuses to do so unless paid more than the contract price, the parties may enter into a new agreement by which an increased price or compensation is to be paid for the same service or property, and that in such case the subsequent performance of the contract by the promisee is a sufficient consideration for the new agreement. Munroe v. Perkins, 9 Pick. 298, 20 Am. Dec. 475; Peck v. Requa, 13 Gray, 408; Holmes v. Doane, 9 Cush. 135; Rollins v. Marsh, 128 Mass. 116; Rogers v. Rogers, 139 Mass. 440, 1 N. E. 122; Lawrence v. Davey, 28 Vt. 264; Moore v. Locomotive Works, 14 Mich. 266; Goebel v. Linn, 47 Mich. 489, 11 N. W. 284, 41 Am. Rep. 723. In my opinion, the cases just cited state the true rule. Upon principle it would seem that the parties to a contract have a perfect right to change or add to its terms for any reason which seems adequate to them, or they may entirely discharge such contract, and substitute another in relation to the same subject-matter; and there is no more legal objection to a promise to pay more for future services contracted for than to an agreement that services shall be other or different from those named in the original contract, with a corresponding increase or reduction in the price to be paid therefor. "There need be no express waiver of the old contract or of some of its terms, to constitute a discharge by substituted agreement. A new contract inconsistent with the original impliedly discharges the latter without an express provision to that effect." Clark, Cont. p. 611. "Such a substituted agreement prima facie takes the place of the original agreement as to everything remaining unperformed." Rogers v. Rogers, 139 Mass. 440, 1 N. E. 122. In the case at ·bar, if the parties·

deemed it for their mutual interest so to do, it was competent for them to enter into the new contract sued on, and when they did this there was an implied discharge of the former contract, and the new became the measure of their rights, unless the consent of the defendant thereto was obtained by duress; and the facts appearing here do not show that the defendant acted under duress, in making that contract. Goebel v. Linn, 47 Mich. 489, 11 N. W. 284, 41 Am. Rep. 723; Hackley v. Headley, 45 Mich. 569, 8 N. W. 511. When the libelants refused to continue in the performance of the original agreement, they rendered themselves legally liable for damages for their breach of contract, and suit might have been brought by the defendant to recover such damages. But this was not the only right of defendant. It had the right to enter into a new contract with the libelants for the performance of the same work, if, upon consideration of all the circumstances, that was deemed by it the best course to pursue. The reasons which justify this conclusion are stated with great force in Goebel v. Linn, 47 Mich. 489, 11 N. W. 284, 41 Am. Rep. 723. The defendants in that case were brewers, and entered into a contract with the Belle Isle Ice Company, by which that company agreed to furnish the defendants with all the ice they might need in their business from November, 1879, to January, 1881, at $1.75 per ton, unless there should be a scarcity of ice during the season of 1880, in which event $2 per ton was to be paid for that season. Ice was furnished under that contract until May, 1880, when defendants were notified by the ice company that it would furnish no more ice at the stipulated price. The defendants were unable to procure ice elsewhere, and were compelled either to stop brewing, and go out of business, at a very great loss, or enter into a new contract with the ice company, by which they agreed to pay $3.50 per ton for ice delivered to them. The defendants chose the latter course, and gave their notes in payment for the ice subsequently delivered to them at the rates fixed in the new contract. The action was to recover upon one of these notes. The defenses were that the note was without consideration, and, secondly, that it was obtained by duress. In passing upon these defenses, in view of the facts just stated, the court, in its opinion, delivered by Mr. Justice Cooley, after stating that there was no ground for the contention that the note was without consideration, said:

"The defense, therefore, is not that the consideration has failed, but that a note for a sum greater than the contract price has been extorted under circumstances amounting to duress. It is to be observed of these circumstances that, if we confine our attention to the very time when the arrangement for an increased price was made, the defendants make out a very plausible case. They had then a very considerable stock of beer on hand, and the case they make is one in which they must have ice at any cost, or they must fail in business. If the ice company had the ability to perform their contract, but took advantage of the circumstances to extort a higher price from the necessities of the defendants, its conduct was reprehensible, and it would perhaps have been in the interest of good morals if defendants had temporarily submitted to the loss, and brought suit against the ice company on their contract. No one disputes that, at their option, they might have taken that course, and that the ice company would have been responsible for all damages legally attributable to the breach of its contract. But the defendants did not elect to take that course. They chose, for reasons which they must have deemed sufficient at the time, to submit to the com-

pany's demand, and pay the increased price, rather than rely upon their strict rights under the existing contract. What these reasons were is not explained to us except as above shown. It is obvious that there might be reasons that would go beyond the immediate injury to the business. Suppose, for example, the defendants had satisfied themselves that the ice company, under the very extraordinary circumstances of the entire failure of the local crop of ice, must be ruined if their existing contracts were to be insisted upon, and must be utterly unable to respond in damages. It is plain that then, whether they chose to rely upon their contract or not, it would have been of little or no value to them. Unexpected and extraordinary circumstances had rendered the contract worthless, and they must either make a new arrangement, or, in insisting in holding the ice company to the existing contract, they would ruin the ice company, and thereby at the same time ruin themselves. It would be very strange if under such a condition of things, the existing contract, which unexpected events had rendered of no value, could stand in the way of a new arrangement, and constitute a bar to any new contract which should provide for a price that would enable both parties to save their interests."

So, in the case at bar, the reason why the defendant did not choose to rely upon the original agreement, and bring an action for the damages occasioned by its breach, may have been, and probably was, because of the inability of the libelants to respond in damages. Under such circumstances it would be strange, indeed, if the law would not permit the defendant to waive the damages caused by the libelants' breach, and enter into the contract sued upon; a contract mutually beneficial to all the parties thereto, in that it gave to the libelants reasonable compensation for their labor, and enabled the defendant to employ to advantage the large capital it had invested in its canning and fishing plant.

3. The contract sued on is that of the defendant. In so finding I have not overlooked the fact that its general superintendent, Murray, testified that he had no authority to enter into such contract for defendant. In making this statement it is evident the witness only testified to his legal opinion in respect to that matter. He certainly did not state any fact upon which to base such a conclusion. The power to employ labor at Pyramid Harbor was, I think, incident to his authority as general superintendent and manager of the business conducted by defendant at that place; but, whether so or not, he assumed to act for the defendant in making the contract, and the defendant obtained, and still retains, the benefit of the services of libelants under such contract, and is therefore estopped from disputing the authority of Murray to act for it in making the contract under consideration.

4. The next question that arises is as to the effect of the settlement made by the defendant with libelants. That there was a controversy at that time between the defendant and the libelants as to the amount due them is not disputed, and libelants were distinctly informed at the time that the sum then paid them by the defendant must be received in full satisfaction of all claims and demands against it, and the receipts signed by them contained a release of all claims and demands held by them against the defendant on account of the matters alleged in the present libel. If this were an action at law, this payment and release would, under the circumstances just stated, operate as a satisfaction of the claims set forth in the libel. Croft v. Lumley, 5 El.

& Bl. 648, 680; McDaniels v. Lapham, 21 Vt. 222; Donohue v. Woodbury, 6 Cush. 148, 52 Am. Dec. 777. And the same result would follow if the contract sued on was governed by section 4552 of the Revised Statutes. The Pennsylvania (D. C.) 98 Fed. 744. But it is not. The contract, while it provides that libelants shall render some services as seamen, is not, strictly speaking, such a contract as is contemplated by section 4552 of the Revised Statutes. That section, as originally enacted, was only intended to relate to merchant seamen (The Cornelia M. Kingsland [D. C.] 25 Fed. 856); and I do not think any of the acts amendatory thereof or supplemental thereto have extended its provisions to contracts like that set out in the libel. The effect of the release must therefore be determined by the rule applied in courts of admiralty when a release is relied upon as a defense to the action. In admiralty a receipt in full of all demands, or a release by a seaman on receiving less than the amount actually due him, does not ordinarily constitute a bar to the subsequent recovery of what he was justly entitled to receive. The David Pratt, 1 Ware (495) 509, Fed. Cas. No. 3,597; Leak v. Isaacson, Abb. Adm. 41, Fed. Cas. No. 8,160; The Rajah, 1 Spr. 199, Fed. Cas. No. 11,538; Savin v. The Juno, 1 Woods, 300, Fed. Cas. No. 12,390. The principle upon which those cases were decided is equally applicable to the present case. That principle, broadly stated, is this: that courts of admiralty are not bound in the decision of cases before them by technical rules, but are governed by enlarged views of equity and justice; and as seamen are usually improvident, and often ignorant of their rights, they are frequently tempted by their necessities to take less than is due them. While, as before stated, the present is not, strictly speaking, a suit for the recovery of seamen's wages, still there is the same reason for looking behind the releases which are relied upon by defendant in this case as if the action were one for the recovery of seamen's wages. The libelants are ignorant fishermen, and are as much entitled to the equitable protection of a court of admiralty as ordinary seamen, and it would not be in accordance with equity to hold that the receipt of less than was due them is a bar to the recovery of the full amount they were entitled to receive according to the terms of the contract under which they performed labor for the defendant.

5. The case of George Bataillou differs from that of the other libelants in this: that the evidence shows that he voluntarily abandoned work under the contract, and was paid in full for all services rendered by him; and there is nothing in the evidence to impeach the fairness of the settlement made by the defendant with him.

A decree will be entered in favor of each of the libelants except George Bataillou for the sum of $50, and interest thereon from date of filing the libel until decree is satisfied, and for costs; and as to George Bataillou the decree will be that he take nothing by this action.